Peter W. Billings, A0330
Kevin N. Anderson, A0100
Douglas J. Payne, A4113
FABIAN VANCOTT,
  a Professional Corporation
215 South State Street, Suite 1200
Salt Lake City, Utah  84111-2323
Telephone:  (801) 531-8900
Facsimile:  (801) 596-2814

*Attorneys for UD Dissolution Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>UD DISSOLUTION CORP.<br>      (fna, V3 Systems, Inc.),<br><br>                    Debtor. | Bankruptcy Case No. 14-32546<br>(Chapter 11) |
| UD DISSOLUTION LIQUIDATING TRUST,<br><br>                    Plaintiff,<br><br>            v.<br><br>SPHERE 3D CORPORATION, incorporated under the laws of the Province of Ontario, Canada; V3 SYSTEMS HOLDINGS, INC., a Delaware corporation; PETER TASSIOPOULOS, an individual; JASON D. MERETSKY, an individual; ERIC L. KELLY, an individual; PETER ASHKIN, an individual; MARIO BIASINI, an individual; GLENN M. BOWMAN, an individual; DANIEL J. BORDESSA, an individual; VIVEKANAND MAHADEVAN, an individual; and JOHN DOES I-X,<br><br>                    Defendants. | **COMPLAINT OBJECTING TO CLAIM NO. 26-1 AND SEEKING OTHER RELIEF**<br><br>Adversary Proceeding No.<br><br>——————<br><br>Honorable Joel T. Marker |

Plaintiff the UD Dissolution Liquidating Trust alleges against Defendants as follows:

## PARTIES

1.       UD Dissolution Liquidating Trust ("**Plaintiff**" or the "**UD Trust**") is a grantor trust and is organized under, and by virtue of, the laws of the State of Nevada, with its principal place of business at Salt Lake City, Utah. The UD Trust is the successor to UD Dissolution Corp., formerly known as V3 Systems, Inc. (the "**Debtor**" or "**V3**").

2.       Debtor is a Nevada corporation incorporated on or about September 3, 2010. On or about June 12, 2014, pursuant to the terms of an asset sale agreement, Debtor changed its name to "UD Dissolution Corp." The Debtor was voluntarily dissolved, pre-petition, on or about November 24, 2014. The Debtor is statutorily authorized under Nevada law to liquidate and wind up its affairs and settle claims with its creditors, including but not limited to filing of a petition for relief under Title 11, United States Code.

3.       Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*., (the "**Bankruptcy Case**") on November 26, 2014 (the "**Petition Date**").

4.       On May 7, 2015, the Debtor filed the *Debtor's Plan of Liquidation, Dated May 7, 2015* (the "**Plan**") in the Bankruptcy Case.

5.       On July 9, 2015, the United States Bankruptcy Court for the District of Utah entered an *Order Confirming Debtor's Plan of Liquidation* ("**Confirmation Order**") confirming the Plan.

6.       The Plan became effective on July 27, 2015 (the "**Effective Date**").

7.      Under the Plan, as of the Effective Date, all causes of action and claims of the

Debtor and the bankruptcy estate were transferred to the UD Trust, which was given power and

authority to prosecute and defend such causes of action.  Plan, ¶ 7.4.

8.      The Plan provides that the UD Trust is the successor to UD Dissolution and has

the right to object to claims and resolve controversies.  Plan, ¶ 1.4.

9.      Defendant Sphere 3D Corporation ("**Sphere**") is a corporation organized under

the laws of Ontario, Canada, with its principal place of business in Mississauga, Ontario,

Canada.  At all times relevant to this Complaint, shares of stock in Sphere were publicly traded,

either on the Toronto Stock Exchange ("**TSX**") and/or the NASDAQ exchange in the United

States.  Sphere purposely availed itself of contacts in this jurisdiction in the acts and transactions

described below.

10.      Defendant V3 Systems Holdings, Inc. ("**Holdings**") is a wholly-owned subsidiary

of Sphere organized under the laws of the state of Delaware, United States of America.  Holdings

was formed by Sphere to execute an asset sale transaction with V3, more particularly described

below.  Holdings purposely availed itself of contacts in this jurisdiction in the acts and

transactions described below.

11.      On April 6, 2015, Sphere and Holdings filed Proof of Claim No. 26-1 (the

"**Sphere Proof of Claim**") in the Bankruptcy Case asserting an unsecured claim in an

undetermined amount based upon alleged breach of the Asset Purchase Agreement by and

among V3, Holdings, and Sphere, dated February 11, 2014.  A copy of the Proof of Claim is

attached hereto as Exhibit "A."

12.      Peter Tassiopoulos ("**Tassiopoulos**") is an individual and a citizen of Toronto,

Ontario, Canada.  From March 2013 Mr. Tassiopoulos was a member of Sphere's Board of

3

Directors, and was Chief Executive Officer of Sphere until December 2014, when he moved to

the role of Vice Chairman and President for Sphere.

13.     Jason D. Meretsky ("**Meretsky**") is an individual and a citizen of Toronto,

Ontario, Canada.  Meretsky is the principal partner of Meretsky Law Offices in Toronto, Canada,

and is a licensed attorney at law with the Ontario Law Society and any other regulatory body

with jurisdiction over the admission and practice of lawyers in Ontario Province, Canada.  He

has acted as legal counsel for Sphere.  From January 2013 to December 2014 Mr. Meretsky was

a member of Sphere's Board of Directors.

14.     Peter Ashkin ("**Ashkin**") is an individual and a citizen of California.  From

January 2012 Mr. Ashkin was a member of Sphere's Board of Directors.

15.     Eric L. Kelly ("**Kelly**") is an individual and a citizen of California.  From July

2013 Mr. Kelly was a member and chairman of Sphere's Board of Directors, and was appointed

Chief Executive Officer of Sphere in December 2014.  He was also Chief Executive Officer and

a director of Overland Storage, Inc. ("**Overland**"), a company that provides data protection

solutions designed for backup and recovery for small and medium business computing

environments.

16.     Glenn M. Bowman ("**Bowman**") is an individual and a citizen of Ontario,

Canada.  From January 2012 Mr. Bowman was a member of Sphere's Board of Directors.

17.     Mario Biasini ("**Biasini**") is an individual and a citizen of Ontario, Canada.  From

October 2009 to December 2014 Mr. Biasini was a member of Sphere's Board of Directors.  He

co-founded Sphere in October 2009 and also served as Sphere's President.  Mr. Biasini's wife, a

trust for his daughter, and Promotion Depot Inc., a company wholly owned by Mr. Biasini, all

owned Sphere stock.

18.     Daniel J. Bordessa ("**Bordessa**") is an individual and a citizen of Ontario,

Canada.  From December 2014 Mr. Bordessa was a member of Sphere's Board of Directors.  He

was an employee of Cyrus Capital Partners, LP, the investment manager of a private investment

fund known as the "Cyrus Funds," which owned the majority of the Overland shares, owned

Sphere shares, and loaned large amounts of money to Overland and Sphere.  He served as the

nominee of the Cyrus Funds on the Overland Board of Directors, and served as the nominee of

Overland on Sphere's Board.

19.     Vivekanand Mahadevan ("**Mahadevan**") is an individual and a citizen of Ontario,

Canada.  From December 2014 Mr. Mahadevan was a member of Sphere's Board of Directors.

He also was a director of Overland since 2012.

20.     Defendants Tassiopoulos, Meretsky, Ashkin, Kelly, Bowman, Biasini, Bordessa,

and Mahadevan are collectively referred to as the "Directors".

21.     Defendants John Does I-X, inclusive, are other persons not yet identified but are

believed to be past or present officers, directors, attorneys, employees, or control persons of

Sphere who knew of and/or participated in the acts alleged below or who hold fiduciary duties to

Sphere shareholders, including V3, or who were involved in the wrongful acts alleged below.

V3 intends to amend this Complaint to add such persons as defendants when their identities

become known.

## JURISDICTION AND VENUE

22.     This is a proceeding to object to a claim in a bankruptcy case pursuant to 11

U.S.C. § 502 and Rule 3007(a) & (b) of the Federal Rules of Bankruptcy Procedure.  This is also

a proceeding seeking the turnover of property pursuant to 11 U.S.C. § 542, and to avoid and

recover fraudulent transfers under 11 U.S.C. §§ 544 and 548.

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C.

§ 1334(b) in that the action arises in and/or relates to the Bankruptcy Case.  This action,

moreover, involves the implementation and execution of the Plan confirmed by this Court in the

Bankruptcy Case, including the prosecution of certain pre-petition claims expressly reserved for

post-confirmation enforcement by the UD Trust.

24.     This Court has jurisdiction over the subject matter and all parties to this adversary

proceeding pursuant to 28 U.S.C. §§ 1334, 157(b)(2)(A), (B), (C), (E), (H), and (O), Fed. R.

Bankr. P. 7001 & 3007(b), and DU Civ. R. 83-7.1(a).

25.     This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B),

(C), (E), (H), and (O).

26.     Venue is proper pursuant to 28 U.S.C. § 1409(a).

## GENERAL ALLEGATIONS OF FACTS

27.     On or about February 11, 2014, the Debtor entered into an Asset Purchase

Agreement and other agreements (the "**APA**") with Sphere and Holdings for the purchase of

substantially all of Debtor's assets for $14.7 million (the "**Transaction**").  The Transaction

closed on or about March 21, 2014 ("**Closing Date**").

28.     Prior to the Closing Date, V3 was engaged in the business of developing,

marketing, and selling computer hardware and software that provided for virtual or desktop

cloud computing solutions ("**Business**").  APA, § 1.1; Recitals, ¶ A.

29.     Negotiation of the APA began in earnest in October 2013 following discussions

between V3's then CEO, Eric Lindstrom ("**Lindstrom**") and Tassiopoulos.  During the

discussions, the parties discussed that the purchase price would be paid in cash and shares of

Sphere stock.  During the discussions, V3 was informed, assumed, and relied upon the fact that

6

the Sphere shares were honestly priced with fair market factors and were not the subject of any fraud, manipulation, or insider dealings.

30.     During the negotiations, V3 disclosed that it had various types of secured, unsecured, and priority tax and wage debt.

31.     Prior to Sphere signing the APA, V3 disclosed that Michael E. Anderer ("**Anderer**") initiated a lawsuit against V3 and other parties in the U.S. District Court for the District of Utah on February 11, 2013, case number 2:13-CV-00111-TC, captioned *Anderer v. Inaura et al.* (the "**Anderer Lawsuit**").  The Anderer Lawsuit asserted that Peter Bookman ("**Bookman**"), V3, and other defendants had misappropriated intellectual property from Inaura, Inc., a company owned by Anderer, Bookman and other shareholders. Sphere was therefore fully aware of the risks related to V3's intellectual property at the time of purchasing V3.

32.     On December 4, 2013, Sphere and V3 signed a letter of intent ("**LOI**") for Sphere to acquire V3 for $14.7 million ("Purchase Price").

33.     The Purchase Price was to be paid by the delivery of (1) $4.0 million in cash, (2) $5.7 million in common stock of Sphere ("**Sphere Stock**"), and (3) an earn-out of up to $5.0 million payable in cash or shares of Sphere stock.

34.     The number of shares to be transferred for the $5.7 million in Sphere Stock was based upon Sphere's average 20-day common stock trading day weighted average closing market price as quoted on the Toronto Stock Exchange Venture ("TSXV") for the period ending the day the LOI was signed, December 4, 2013.  That share price was $5.23 per share, for a total of 1,089,867 shares of Sphere Stock.

35.     Following the LOI, Sphere undertook extensive due diligence on V3.  Sphere had full cooperation and assistance from V3 and professionals Sphere had retained.

36.     Among other things, Sphere sent a financial team from Toronto, Canada, to Utah to examine the books and records of V3.  In addition, V3's transactional counsel opened and populated a virtual data room to which Sphere had full access.  V3 and its counsel deposited all relevant contracts, financial documents and other documents relevant to the negotiations and appropriate for due diligence in a transaction of this type.

37.     During the due diligence period V3 struggled to pay operating costs.  Sphere was aware of this as some of the money V3 needed to operate came from Sphere.  In December 2013, Sphere began fulfilling orders for V3 products pursuant to an informal master distributor arrangement between Sphere and V3.  This allowed Sphere to report revenue on its books, and provided operating funds for V3.  The money from Sphere was treated as a loan and deducted from the cash portion of the Purchase Price at the Closing of the Transaction.

38.     The available period for due diligence by Sphere was extended for several weeks, and lasted until February 11, 2014, when an agreement was signed.

39.     The financial records provided during the due diligence period were accurate as of December 31, 2013 based upon the information then available to V3.

40.     Sphere never asked for updated financials prior to the Closing Date.

41.     Unbeknownst to V3, during December 2013, Overland and Sphere discussed a possible joint venture ownership of V3.  Overland had received several notifications from The NASDAQ Stock Market, LLC indicating non-compliance with NASDAQ's requirements and warnings that Overland's stock would be delisted from NASDAQ Capital Market.

42.     While these merger discussions between Overland and Sphere did not proceed to a definitive agreement, they eventually led to a merger of the two companies.

43.     On February 11, 2014 V3, Sphere, and Holdings entered into the APA.

44.     Under the APA, V3 transferred substantially all of its assets including but not limited to its contract rights, goodwill, intellectual property, hardware, receivables, cash on hand, names and trademarks, software, licenses, and tangible personal property, to Sphere.

45.     The consideration Sphere promised to pay for the assets acquired under the APA was the same three essential components set forth in the LOI:

a.     Cash in the sum of $4 million.

b.     1,089,867 shares of Sphere stock based on a value of $5.23 per share for a total stock value of $5.7 million (defined in the APA as the "Initial Shares")

c.     An Earn-Out based upon a stepped amount of revenues achieved by Sphere from sales originating from V3's Business, as defined in the APA (the "**Earn-Out**") which was to be maintained as a funded and supported Sphere business unit after the asset purchase.  The Earn-Out could extend over a maximum of 15 months from the closing date and had a value in the Transaction of $5 million, payable in stock or cash.

46.     The APA provides that the Sphere Stock would be legended and subject to a resale restriction of four months plus one day from the date of issuance, in accordance with provisions of the Canadian Securities Act and, applicable in the United States, pursuant to an exemption provided under Rule 904 of Regulation S of the U.S. Securities Act, the so-called "904 exemption."

47.     Significantly, there were no other restrictions on V3 being able to sell the Sphere Stock.  V3 explained that it would need to use the proceeds from the sale to pay these debts.  V3 disclosed to Sphere that V3's creditors had agreed not to pursue collection based on the expectation that they would be paid out of the proceeds.  Accordingly, there was no requirement

in the APA that V3 could only sell Sphere Stock at a particular controlled rate, an agreement sometimes known as a "leak out" provision.

48.    The Transaction was valued at $14.7 million.

49.    Crucially, in accepting $10.7 million (approximately 73% of the Transaction value) in deferred consideration in the form of Sphere Stock and Earn-Out, at the time of signing the LOI, and later the APA and subsequent Closing, V3 relied upon information provided by Sphere concerning the amount of cash Sphere had available to fund V3's Business and meet Sphere's post-closing obligations to support the Earn-Out.  V3 was unaware of Sphere's undisclosed plans to merge with Overland which would affect Sphere's ability to fund V3's business plan.  Had V3 known about the prospect of a Sphere/Overland merger prior to Closing, V3 likely would have requested a higher percentage of the Transaction value in cash.

50.    On the Closing Date, Sphere paid the cash portion of the Purchase Price with $5 million in financing from Cyrus Funds.  Cyrus Funds owned the majority of the Overland shares and also held certain convertible notes and other loans issued by Overland, that were assumed by Sphere, and convertible debentures issued by Sphere.  Cyrus Funds had a designee, Bordessa, on Sphere's Board of Directors.

51.    Sphere was aware that the cash proceeds from the APA were not sufficient to pay all of V3's debts as of the Closing Date.  Sphere and V3 identified claims that encumbered any assets to be transferred, and prioritized which would be (and were) paid upon Closing.

52.    Sphere was fully aware that V3 needed to negotiate and pay additional debts after the Closing Date through liquidation of its Sphere Stock and receipt of the Earn-Out funds.  V3 provided a schedule showing how the cash from the closing would be distributed and which debts would be paid after V3 was able to sell its Sphere Stock.

10

53.     Both before and after the Closing Date, Lindstrom discussed this state of V3's financial affairs in some detail with Tassiopoulos, Meretsky, and other Directors.

54.     The amount of cash actually provided to V3 was reduced by the initial deposit of $50,000 paid by Sphere, repayment of outstanding "Seller Interim Funding Notes" (APA, § 4.2(a)), as well as an amount held back due to pending litigation.

55.     The number of shares V3 actually received also was reduced.  The APA provided for two stock holdbacks.  Sphere was allowed to retain a number of the Initial Shares equal to $500,000 on the Closing Date (the "**Holdback Shares**").  APA, § 4.2(b).

56.     Sphere held back 95,603 shares of stock.  These Holdback Shares were to be paid and transferred to V3 no later than June 31, 2015, subject to any required adjustment pursuant to and in accordance with Section 4.5 of the APA.

57.     The second holdback was for the Anderer Lawsuit and included stock (also determined by the number of the Initial Shares equal to $500,000), and $200,000 in cash, reducing the cash proceeds otherwise payable to V3 (the "**Litigation Holdback**").

58.     Sphere held back an additional 95,603 shares of stock for the Litigation Holdback. These Litigation Holdback Shares are to be paid and transferred to V3 following the settlement or other resolution of the Anderer Lawsuit, subject to any required adjustment under specified terms and conditions.  APA, Schedule 6.13A, § 2(b).

59.     There should be no restrictive legend on the Litigation Holdback shares when they are transferred to V3.

60.     In order to support the Earn-Out covenant, Sphere agreed to:

        a.     Maintain separate accounting measures so that the Earn-Out Revenue can be calculated.

b.      Maintain the Business (or product line) as an independent stand-alone business unit to be operated by Lindstrom pursuant to an employment agreement with Lindstrom ("**Lindstrom Contract**").

c.      Provide the business unit with a budget and personnel resources.

d.      Pay the monthly burn rate costs and expenses to operate the Business in a viable manner, including payment of all material and labor costs, freight, shipping and handling, overhead costs, and other sales, general and administrative expenses.

61.      Sphere agreed that following Closing and during the Earn-Out Period V3 had the right to appoint Lindstrom as one of three members of the Board of Directors of Holdings.

62.      V3 had good commercial relationships with its customers and suppliers when Sphere took over the Business.  To maintain these relationships, Sphere identified five key employees and offered them employment.

63.      As provided in the APA, V3's certificated Sphere Stock contained a restrictive legend restricting their resale according to Canadian securities laws for a period of four months plus one day from the Closing Date, and any additional restrictions as may be required per applicable United States securities laws or otherwise.

64.      The parties to the APA understood and based the agreement upon the understanding that the restrictive legend would be removed on July 24, 2014.  Otherwise, V3 would not have agreed to the final terms of the APA.

65.      After the Closing Date, V3's Board of Directors approved a plan of dissolution under Nevada law to be submitted to the shareholders.  A key component of the plan of dissolution was the orderly liquidation of the Sphere Stock, and receipt of the Earn-Out for payment to creditors and dividends to shareholders, in accordance with applicable law.

66.     V3 considered borrowing money from Sphere to facilitate payment of its creditors before V3 could begin to sell its Sphere Stock in July 2013.  Because Sphere insisted on terms V3 considered onerous, such as payments to Bookman, a leak out restriction on V3's sale of its Sphere Stock, V3 did not borrow money from Sphere after the Closing.

67.     Less than 2 months after the Closing, on May 15, 2014, Sphere announced its agreement to merge with Overland.

68.     Among other things, it was announced that Sphere agreed to issue a large quantity of Sphere stock—over 8.5 million Sphere shares—to Overland shareholders.

69.     Prior to the execution of the APA and the Closing Date, Sphere never communicated to V3 that it was considering a merger with Overland, or the effect of that merger on the Business.

70.     If V3 had been aware of Sphere's plans to acquire Overland and issue over 8.5 million shares to Overland shareholders, V3 likely would not have agreed to take a large portion of the consideration in Sphere stock.

71.     Prior to completion of its merger with Overland, Sphere involved Overland in the operation of the Business.  In addition, Sphere took actions, directly or indirectly, intentionally and purposely to avoid or reduce the Earn-Out payments to V3 in violation of the APA.  Among other things, Sphere:

        a.     Failed to expend, pay and be responsible for the monthly burn rate costs and expenses to operate the Business in a manner consistent with the covenants of the parties in the APA, in violation of the APA.

b.      Failed to provide the Business with reasonable access to the personnel, sales force, equipment and other assets of Sphere as required to achieve the maximum Earn-Out amount applicable under the APA, in violation of the APA.

c.      Failed to maintain the Business or product line as an independent stand-alone business unit operated by Lindstrom in accordance with the APA, or provide the Business with budgetary and personnel resources as required by the APA, in violation of the APA.

d.      Breached the Lindstrom Contract by, among other things, transferring its obligations to Overland, failing to provide stock and other benefits, and imposing work requirements for other Sphere and Overland activities not related to the Business, in violation of the APA.

e.      Failed to appoint V3's nominee to the Board of Directors for Holdings.

72.     When the statutory restriction period expired, the restrictive legend on V3's certificated Sphere Stock should have been removed through the transfer agent issuing a new unrestricted certificate.  In Canada, this process required the consent of Sphere, the issuer of the securities.  These consents are, in normal commerce, perfunctory and routine.

73.     On or around July 24, 2014, a separately certificated 718,000 shares of stock was submitted to Sphere's transfer agent for removal of the restrictive legend.  A request for consent by Sphere was made by the transfer agent.

74.     On July 31, 2014, Meretsky, on behalf of Sphere, sent an email to the transfer agent, without notifying V3, stating that Sphere objected to lifting the legend, and erroneously asserting that V3 was subject to the U.S. holding period of six months.

14

75.     Meretsky falsely represented to V3 that Sphere's outside counsel, Richard
Raymer of Dorsey and Whitney-Toronto, had opined that V3 was deemed an "affiliate" of
Sphere under U.S. securities laws and regulations and, as such, V3 could not sell its shares on the
Canadian market under the shorter four-month and one day Canadian holding period.

76.     In a ploy to delay V3's right to sell its Sphere Stock, Sphere told V3 that V3 had
to obtain and present a legal opinion as to why the legend should be removed.

77.     In August 2014, V3 put Meretsky, Tassiopoulos, and Sphere's counsel in touch
with a well-respected Canadian securities attorney retained by V3, William McDonald, Esq. of
McDonald Klusky, Vancouver, British Columbia, who opined that there was no justification for
failing to remove the legend.

78.     Sphere, Directors, and other representatives of Sphere continued to object to and
refuse to cooperate with removal of the restrictive legend even though Sphere had no legal basis
to do so.

79.     Directors, and others at Sphere, made up other excuses for refusing to cooperate
with removal of the restrictive legend.

80.     The intentional and bad faith interference of Sphere, the Directors, and unknown
John Doe Defendants with V3's rights under the APA, particularly to own, control, and be able
to freely trade its Sphere Stock and to achieve the Earn-Out, were intended to:

    a.     Extort a leak out provision from V3 and cover up Sphere's failure to
    negotiate a leak out provision in the APA;

    b.     Impose terms on V3 that were neither negotiated nor agreed to in the
    APA;

    c.     Facilitate the Overland acquisition;

      d.      Protect the personal exit strategies of some of the Directors and unknown John Doe Defendants; and

      e.      Otherwise protect the share price of Sphere stock for themselves, as well as for friends and family of Sphere's officers and directors, and other investors in selling Sphere stock and in redeeming the warrants, and options.

81.      Sphere and the Directors also assisted with and made demands by and for and on behalf of Bookman for settlement of claims under threat of withholding liquidity from V3 and premised upon false, pretextual claims of interference with the Bookman employment arrangements under Section 8.10 of the APA.

82.      Because of the meritless, false, and improper objections and other actions taken by Sphere, Directors, and other representatives of Sphere, V3 was unable to have the restrictive legend removed on or around July 24, 2014 and was unable to sell its Sphere Stock at that time, and for many months thereafter.

83.      V3 defaulted on significant debt payments and modification obligations it made in reliance on its right to sell its Sphere Stock.  Sphere was aware of these debts and modification obligations.

84.      V3 was unable to receive and sell the Holdback Shares at a more favorable price.

85.      After the Closing Date, Sphere's shares increased in value on the TSX and the shares held by V3, if liquidated, would have provided full payment of all creditor claims, administrative expenses in its wind-up and dissolution, and also provide a significant return to V3's shareholders.

86.      In September 2014, Anderer resurrected the dormant Anderer Lawsuit and sought a temporary restraining order to prevent V3 from removing the restrictive legend from its Sphere

Shares after the Rule 144 six month time period expired on September 22, 2014.  At a deposition

and at the temporary restraining order hearing, Bookman falsely testified that V3 improperly

obtained assets and intellectual property from Inaura, Inc.  These statements by Bookman

directly contradicted prior statements and sworn testimony of Bookman that V3 rightfully

possessed its intellectual property.

87.     Knowing that the Anderer Lawsuit was meritless and the Bookman testimony was

false, Sphere used the Anderer Lawsuit and the perjured Bookman testimony as an additional

excuse to stop V3 from being able to sell its shares and to obtain a leak-out provision.

88.     Following September 2014, as a direct and proximate result of Sphere's

interference with V3's right to liquidate its Sphere Stock as of July 24, 2014 and September 22,

2014, V3 defaulted on several secured and unsecured debt payments it had negotiated in reliance

on the provisions of the APA and representations from Sphere.

89.     At that same time, V3 lacked the liquidity to fund its dissolution, pay its

professionals, or satisfy its debt payment agreements, all of which Sphere knew.

90.     Sphere's improper conduct drove V3 to a point of financial desperation.

Financially distressed and unable to make payments to creditors and make payroll, V3 was

forced to enter in to a "leak out" agreement with Sphere.

91.     The leak out agreement, signed by Sphere and V3 on October 10, 2014 ("**October**

**10, 2014 Agreement**"), provided for a highly restrictive leak out restriction on the sale of V3's

Sphere Stock, for direct cash funding by Sphere of certain amounts due to creditors and

professionals on an agreed schedule (which fully disclosed, again, V3's unpaid liabilities),

provided other creditor protection to V3, and provided for the release of $100,000 from the

Litigation Holdback to pay for the defense of the Anderer Lawsuit.  (A true and correct copy of the October 10, 2014 Agreement is attached as Exhibit "B.")

92.     But for Sphere's refusal to allow the restrictive legend to be removed, which caused V3's desperate cash circumstances, V3 would not have agreed to the terms in the October 10, 2014 Agreement.

93.     The restrictive legend finally was removed after Sphere consented under the "904 exemption" Sphere previously insisted was inapplicable.  Under the "904 exemption" the restrictive legends should have been removed as of July 24, 2014.

94.     As a direct and proximate result of Sphere's interference with the sale of V3's Sphere Stock, limited stock sales under the October 10, 2014 Agreement could not begin until the end of October 2014, three months after the July 24, 2014 expiration of the Canadian restricted period.

95.     V3 abided by the terms of the October 10, 2014 Agreement.  However, when the first controlled sales of shares yielded too little cash to pay the scheduled obligations, V3 made a demand for Sphere to cover the shortfall or allow additional Sphere Stock to be sold, as provided in the October 10, 2014 Agreement.  Sphere failed and refused to fund the request.

96.     V3's creditors were threatening legal actions such as foreclosure of security interests, entry of confessed judgments, and other collection action.  V3, due to its inability to keep its promises, lost credibility with creditors and was unable to effectively negotiate creditor claims to avoid creditor actions.

97.     Creditors Abundance Capital and Arrow Electronics, both of whom held confessions of judgment, and, in the case of Abundance, broad security interests in V3 assets,

gave notice of intent to enter the confessed judgments and to foreclose their security interests, all of which would have been detrimental to V3's creditors and shareholders.

98.     In order to protect the interests of shareholders and creditors, V3 was compelled to commence the Bankruptcy Case on the Petition Date.

99.     In January and February 2015, the accountant hired by the bankruptcy estate unsuccessfully tried to get adequate information concerning the Earn-Out, and on February 20, 2015 objected to the determination of the calculation of the Earn-Out Amount.

100.    On March 17, 2015 the Debtor demanded turnover of the property of V3.

101.    On April 6, 2015 Sphere filed the Sphere Proof of Claim for an "unknown" or "undetermined" amount.  Sphere has not amended the Sphere Proof of Claim to assert the amount of damages.

102.    The Sphere Proof of Claim asserts the following breaches under the APA:

        a.     False representations and warranties concerning financial statements, tax matters, pending applications for intellectual property rights, technical specifications of its software and hardware, efforts to protect rights in confidential information and trade secrets, good commercial relationships with customers and suppliers, and what it intended to do with some of the shares of the common stock of Sphere Debtor was acquiring.

        b.     Failing to use funds at closing to pay identified payables or other obligations on or contemporaneous with the closing, including obligations owed to the Internal Revenue Service, in violation of a covenant to pay all accounts payable in the ordinary course of business or other obligations on or contemporaneous with the closing.

103.    On April 7, 2015, Sphere was given written notice of the breaches of Earn-Out

provisions of the APA, and notice of acceleration of the Earn-Out entitlement.

### OBJECTION TO PROOF OF CLAIM

**FIRST CLAIM FOR RELIEF**
**(Objection to Claim – False Representations and Warranties)**

104.    Plaintiff restates and re-alleges each and every allegation contained in the

previous paragraphs of this Complaint, and incorporates the same by reference as though fully

set forth herein.

105.    The representations and warranties made by V3, including those relating to

financial records, tax filings, patent applications, software and hardware technical specifications,

and confidential information and trade secrets, among others, were materially true and accurate.

106.    In addition, Sphere covenanted that it had completed its due diligence

investigation of V3 to its reasonable satisfaction, APA § 9.1(h), and is estopped from asserting

claims based upon alleged breaches of representations and warranties that it was aware of or

reasonably could have discovered.

107.    Any alleged deficiencies in the representations and warranties were known to

Sphere, or reasonably could have been discovered, and Sphere has waived any such claims.

108.    Sphere failed to mitigate any purported harm that resulted from alleged breaches

of representations and warranties.  Among other things, Sphere interfered with the achievement

of the Earn-Out by V3 and interfered with V3's efforts to sell Sphere Stock.

## SECOND CLAIM FOR RELIEF
### (Objection to Claim – Violation of Covenants)

109.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

110.    Debtor fully performed its covenant to pay all of its accounts payable in the ordinary course of business and all other obligations on or contemporaneous with the Closing.

111.    Sphere's conduct and breaches described above made it impossible for V3 to pay its creditors and any other covenant that Sphere alleges that V3 breached.

112.    Sphere is estopped from asserting claims based upon any alleged breach of any covenant that it was aware of or reasonably could have discovered.

113.    Any alleged deficiencies in the performance of its covenant were known to Sphere or reasonably could have been discovered, and Sphere has waived any such claims.

114.    Sphere failed to mitigate any purported harm that resulted from alleged breaches of covenants.  Among other things, Sphere interfered with the achievement of the Earn-Out by V3 and interfered with V3's efforts to sell Sphere Stock.

## THIRD CLAIM FOR RELIEF
### (Objection to Claim – Not Entitled to Offset)

115.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

116.    Sphere asserts its claims for breach of contract under the APA should serve to offset claims by Debtor, to the extent Debtor asserts claims against Sphere.

117.   Based upon its breaches of the APA and the objections to Sphere's Proof of Claim set forth in Claims for Relief First through Second.

## FOURTH CLAIM FOR RELIEF
### (Objection to Claim – Subordination under 11 U.S.C. § 510(c))

118.   Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

119.   Sphere has engaged in wrongful behavior and acted in bad faith in relation to Debtor.

120.   Sphere's actions have harmed Debtor's creditors and investors, all of whom are beneficiaries under the UD Trust.

121.   To the extent that Sphere's claim is held to be an allowed claim, or if Sphere asserts additional claims that are determined to be allowed claims, such claims must be subordinated pursuant to 11 U.S.C. § 510(c) and all applicable principles of equitable subordination incorporated by that Section to all beneficiaries of the UD Trust.

## FIFTH CLAIM FOR RELIEF
### (Objection to Claim – Setoff)

122.   Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

123.   Sphere is liable to Debtor for amounts far in excess of any amounts asserted in the Proof of Claim based upon the claims asserted against Sphere in Claims for Relief Seventh through Twenty-Fourth, below.

124.    Plaintiff is entitled to offset any amounts due the Debtor from Sphere against amounts claimed by Sphere in its Proof of Claim.

## SIXTH CLAIM FOR RELIEF
### (Other Defenses to Proof of Claim)

125.    <u>Failure to Plead with Particularity</u> – Sphere's assertions of false representations are not stated with particularity, as required by the rules.  The Sphere Proof of Claim fails to provide any of the who, what, when, where, and how circumstances of the alleged false representations.

126.    <u>Prevention and Failure of Performance</u> – In addition to preventing V3 from performing by interfering with the achievement of the Earn-Out by V3 and interfering with V3's efforts to sell Sphere Stock, Sphere undermined the good commercial relationships V3 had developed.  Sphere did little to sell V3's appliances to existing customers, apparently because it wanted to develop new appliances to bring to market.  Sphere is barred from any recovery because it failed to perform its obligations under the APA.

127.    <u>Frustration of Purpose</u> – Enforcement of § 6.28 as now interpreted by Sphere would go against the very purpose of the APA, to provide V3 the means to pay its debts and provide a return to its investors.

128.    <u>Failure of Condition Precedent</u> – V3's performance of some of its obligations was dependent upon Sphere's performance of the Earn-Out provision and removal of the restrictive legend.  The Debtor asserts that recovery by Sphere is precluded for failure of the occurrence of a condition precedent.

129.    <u>Breach of APA by Sphere</u> – The Debtor asserts that Sphere is barred from recovery because of its breaches of contract, and by its breaches of the covenants and conditions

of the APA, thereby extinguishing and terminating the duties allegedly owed by the Debtor, or

reducing or abating the amount of damages to which Sphere may be entitled.

130.    <u>Failure to Act in a Commercially Reasonable Manner</u> – The Debtor asserts that

Sphere is barred from recovery because of its breach of covenant of good faith and fair dealing,

set forth below.

131.    <u>Unclean Hands</u> – The Debtor asserts that Sphere is barred from recovery because

of its unclean hands.  Among other things, Sphere invented reasons to refuse to remove the

restrictive legend, and thwarted V3's recovery of any Earn-Out amount, thereby creating V3's

financial distress, then used that financial distress, the Anderer Lawsuit and perjured testimony

of Bookman as an excuse not to perform the APA, to obtain a new leak-out provision, and to

stop V3 from being able to sell its Sphere Stock.

WHEREFORE, the Court should enter an order and judgment disallowing Sphere's Proof

of Claim in its entirety.

### CLAIMS FOR AFFIRMATIVE RELIEF AGAINST SPHERE 3D

### SEVENTH CLAIM FOR RELIEF
### (Turnover of Maximum Earn-Out Amount)

132.    Plaintiff restates and re-alleges each and every allegation contained in the

previous paragraphs of this Complaint, and incorporates the same by reference as though fully

set forth herein.

133.    Part of the purchase price to be paid to V3 under the APA was the Earn-Out

Amount.

134.    The APA contained several post-Closing covenants which were designed to

facilitate the performance of the APA and the success of the combined business to achieve the

Earn-Out.  Sphere pledged that it:

        a.       Would not, directly or indirectly, take any action that would have the purpose of avoiding or reducing any of the Earn-Out Payments.

        b.       Would not take any action to reduce the operational ability of the Business to achieve the maximum Earn-Out Revenue.

        c.       Would not take any action to reduce the amount of the Earn-Out Amount to be paid to V3.

135.    Sphere further agreed that it would not take any action to reduce the operational ability of the Business to achieve the maximum Earn-Out Revenue.

136.    Sphere also agreed to take certain actions to support the Earn-Out covenant.

137.    The APA provides that if these covenants in support of the Earn-Out were not met and any breaches not cured, then V3 shall be deemed to have fully earned and achieved the maximum amount of the Earn-Out amount, as if during the Earn-Out Period the business had achieved Earn-Out revenue equal to $12.5 million.

138.    Sphere has breached the APA with respect to the Earn-Out.

139.    Sphere and Directors have been aware of such breaches for more than 30 days prior to the filing of this Complaint and have not cured them.

140.    In light of Sphere's and Directors' breaches, V3 is deemed to have fully earned and achieved the maximum amount of the Earn-Out Amount.

141.    The imputed achievement of $12.5 million in revenue entitles V3 to full immediate payment of a maximum Earn-Out which is $5 million.

142.    The maximum amount of the Earn-Out Amount due to V3 is payable either by Earn-Out Shares, valued at a price as set forth in the APA, or in cash.

25

143.    The maximum amount of the Earn-Out Amount is of the type that the UD Trust could use, sell or lease pursuant to Section 362 of the Bankruptcy Code and is not of inconsequential value or benefit to the estate.

WHEREFORE, the Debtor requests the Court enter judgment against Sphere and Directors ordering turnover of the value of the maximum Earn-Out Amount of $5 million payable either by Earn-Out Shares, valued at a price as set forth in the APA, or in cash, under 11 U.S.C. § 542, and for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

### EIGHTH CLAIM FOR RELIEF
### (Turnover of Holdback Shares)

144.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

145.    The Holdback Shares were to be paid and transferred to V3 no later than June 21, 2015.

146.    Sphere and Directors have failed and refuse to release the Holdback Shares.

147.    The Holdback Shares constitutes property of the Debtor's estate.

148.    The Holdback Shares are of the type that the UD Trust could use, sell or lease pursuant to Section 362 of the Bankruptcy Code and is not of inconsequential value or benefit to the estate.

WHEREFORE, the Debtor requests the Court enter judgment against Sphere and Directors ordering turnover of the Holdback Shares under 11 U.S.C. § 542, and for its costs,

interest, and for such other and further relief as the Court deems just and equitable in the premises.

## NINTH CLAIM FOR RELIEF
### (Avoidance of Constructively Fraudulent Transfer)

149.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

150.    Pursuant to section 544 of the Bankruptcy Code, UD Trust has the rights of an existing unsecured creditor of V3 and can assert claims and causes of action that such creditor could assert.

151.    Prior to the Closing Date, V3 developed and owned valuable assets, including, but not limited to, intellectual property, hardware, tangible personal property, know-how, goodwill, trademarks, trade names, and related assets.

152.    The value of the assets conveyed by V3 to Sphere under the APA, is established by the bargained-for contract price of $14.7 million.

153.    As a direct result of Defendants' schemes, acts, omissions and conduct, V3 completed the Transaction without receiving reasonably equivalent value for the assets conveyed by V3 to Sphere under the APA.

154.    As a result, Sphere and Directors have received a constructively fraudulent transfer which must be avoided or compensated in money damages.

155.    The Debtor is entitled to a judgment for an amount in excess of $10 million to compensate for the loss in the fair value of the Transaction.

WHEREFORE, the Debtor requests entry of judgment against Sphere and Directors requiring either return of the assets conveyed in the APA or a money judgment for an amount in excess of $10 million, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

### TENTH CLAIM FOR RELIEF
### (Breach of Contract:  Earn-Out and Acceleration)

156.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

157.    Part of the purchase price to be paid to V3 under the APA was the Earn-Out Amount.

158.    The APA contained several post-Closing covenants which were designed to facilitate the performance of the APA and the success of the combined business to achieve the Earn-Out.

159.    Among other things, Sphere agreed that it would not take any action that would have the purpose of avoiding or reducing any of the Earn-Out Payments.

160.    Sphere further agreed that it would not take any actions to reduce the operational ability of the Business to achieve the maximum Earn-Out Revenue.

161.    Sphere also agreed to take certain actions to support the Earn-Out covenant.

162.    The APA provides that if these covenants in support of the Earn-Out were not met and any breaches not cured, then V3 shall be deemed to have fully earned and achieved the maximum amount of the Earn-Out amount, as if during the Earn-Out Period the business had achieved Earn-Out revenue equal to $12.5 million.

28

163.     Sphere and Directors took actions that avoided or reduced the Earn-Out Payments and reduced the operational ability of the Business to achieve the maximum Earn-Out Revenue. Sphere and Directors also failed to take agreed upon actions to support the Earn-Out covenant.

164.     V3 has fully performed all material terms of the APA.

165.     Sphere has breached the APA with respect to the Earn-Out.

166.     Sphere and Directors have been aware of such breaches for more than 30 days prior to the filing of this Complaint and have not cured them.

167.     In light of Sphere's and Directors' breaches, V3 is deemed to have fully earned and achieved the maximum amount of the Earn-Out Amount.

168.     The imputed achievement of $12.5 million in revenue entitles V3 to full immediate payment of a maximum Earn-Out which is $5 million.

169.     The maximum amount of the Earn-Out Amount due to V3 is payable either by Earn-Out Shares, valued at a price as set forth in the APA, or in cash.

WHEREFORE, the Debtor requests the Court enter judgment against Sphere and Directors in the sum of $5 million or the value of the Earn-Out Shares, whichever is greater, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

## ELEVENTH CLAIM FOR RELIEF
### (Breach of Contract:  Failure to Remove Legend)

170.     Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

171.     Part of the purchase price to be paid to V3 under the APA were the Initial Shares.

172.    The legend restricting resale of the Initial Shares was to be removed after a period of four months plus one day from the Closing Date.

173.    V3 took all steps required by the APA for the restrictive legends to be removed from the Initial Shares and otherwise fully performed all material terms of the APA.

174.    Sphere and Directors improperly objected to removal of the restrictive legend and undertook to prevent removal of the restrictive legend in breach of the APA.

175.    Because of the actions taken by Sphere and Directors in breach of the APA, V3 was unable to have the restrictive legend timely removed.

176.    Because of Sphere's and Directors' breach of the APA, the Debtor suffered damages including, but not limited to, defaulting on significant debt payments and other obligations made in reliance on V3's right to sell its Sphere Stock; being unable to sell the Initial Shares at a more favorable price; being forced to enter into the October 10, 2014 Agreement that included, among other things, a leak out provision that further restricted V3's right to sell its Sphere Stock and to sell the Initial Shares at a more favorable price.

WHEREFORE, the Debtor requests the Court enter judgment against Sphere and Directors for an amount in excess of $10 million to compensate the Debtor for the damages caused, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

### TWELFTH CLAIM FOR RELIEF
### (Breach of Contract:  Failure to Appoint V3's Nominee to Holdings' Board)

177.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

178.     Sphere agreed that following Closing and during the Earn-Out Period V3 had the

right to appoint Lindstrom as one of three members of the Board of Directors of Holdings.

179.     Sphere and Directors breached the APA by failing to appoint or to cause the

appointment of a V3 nominee to the board of directors of Holdings.

180.     V3 was damaged by not having its nominee serve on the board of directors of

Holdings.

181.     V3 is entitled to have its nominee serve on the board of directors of Holdings,

effective retroactively to the Closing Date, and have all resolutions and other actions of the board

of directors of Holdings reopened for vote with participation by the V3 designated director.

WHEREFORE, the Debtor requests entry of an order by the Court of specific

performance allowing its nominee to serve on the board of directors of Holdings, effective

retroactively to the Closing Date, and additional decree of specific performance requiring that all

resolutions and other actions of the board of directors of Holdings be reopened for vote with

participation by the V3 designated director.  Debtor further requests the Court enter judgment

against Sphere and Directors in an amount to compensate the Debtor for the damages caused, for

its costs, interest, and for such other and further relief as the Court deems just and equitable in

the premises.

## THIRTEENTH CLAIM FOR RELIEF
### (Breach of Contract:  Holdback Shares)

182.     Plaintiff restates and re-alleges each and every allegation contained in the

previous paragraphs of this Complaint, and incorporates the same by reference as though fully

set forth herein.

31

183.    These Holdback Shares were to be paid and transferred to V3 no later than June 21, 2015.

184.    Sphere and Directors have failed and refused to release the Holdback Shares at the time and under the conditions required by the APA.

185.    Because of Sphere's and Directors' breach of the APA, V3 suffered damages including, but not limited to, defaulting on significant debt payments and other obligations made in reliance on V3's right to timely receive and sell the Holdback Shares; being unable to receive and sell the Holdback Shares at a more favorable price; being forced to enter into the October 10, 2014 Agreement that included, among other things, a leak out provision that further restricted V3's right to receive and sell the Holdback Shares and to sell the Holdback Shares at a more favorable price.

WHEREFORE, the Debtor requests the Court enter judgment against Sphere and Directors in an amount to compensate the Debtor for the damages caused, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

## FOURTEENTH CLAIM FOR RELIEF
### (Breach of Contract:  October 10, 2014 Agreement)

186.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

187.    Because of Sphere's and Directors' breach of the APA, V3 was forced to enter into the October 10, 2014 Agreement that included, among other things, a leak out provision that further restricted V3's right to sell its Sphere Stock and to sell the Initial Shares and Holdback Shares at a favorable prices.

188.    In spite of this, V3 abided by the terms of the October 10, 2014 Agreement.

189.    Sphere and Directors breached the October 10, 2014 Agreement by failing and refusing to advance sufficient cash to cover deficiencies in cash caused by a shortfall in V3's sale of Sphere Stock as agreed, or to allow the Debtor to sell additional Sphere Stock to meet such shortfall.

WHEREFORE, the Debtor requests the Court enter judgment against Sphere and Directors in an amount to compensate the Debtor for the damages caused, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

## FIFTEENTH CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing Under the APA)

190.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

191.    Implied in the APA is a covenant of good faith and fair dealing that imposed a duty upon Sphere and Directors not to engage in acts or omissions that would destroy or injure V3's right to receive the benefits owed or reasonably expected under the APA.

192.    Sphere and Directors violated this duty of good faith and fair dealing by, among other things:

a.    Making false and unsupported objections to brokers, transfer agents and exchanges that effectively blocked V3's ability to sell any Sphere Stock, including the Initial Shares and Holdback Shares;

b.    Interfering with V3's creditors, disputed and otherwise, including, but not limited to, Bookman, Anderer, and Volker Wiora AG, a German corporation ("**Wiora**");

33

c.      Withholding V3's liquidity in the market to, among other things, protect

Sphere against independent problems with short sellers and to protect insider options and

warrants not connected to or caused by V3; and

d.      Using Bookman's perjured testimony in the Anderer Lawsuit, to obtain

out a leak-out provision in the October 10, 2014 Agreement, and otherwise stop V3 from

being able to sell any Sphere Stock, including the Initial Shares and Holdback Shares.

193.    These actions were intended to, and did, destroy or injure V3's right to receive the

benefits owed or reasonably expected under the APA while serving the goals of Sphere and

Directors.

194.    As a result of Sphere's and Directors' breach of the duty of good faith and fair

dealing, the Debtor has suffered damages.

WHEREFORE, the Debtor requests entry of judgment against Sphere and Directors for

all damages resulting from its breach of the implied covenant of good faith and fair dealing as

may be proven by competent evidence at trial, for its costs, interest, and for such other and

further relief as the Court deems just and equitable in the premises.

### SIXTEENTH CLAIM FOR RELIEF
### (Interference With Existing Economic Relations)

195.    Plaintiff restates and re-alleges each and every allegation contained in the

previous paragraphs of this Complaint, and incorporates the same by reference as though fully

set forth herein.

196.    On February 5, 2013, Bookman executed a separation agreement ("**Separation**

**Agreement**") with V3.  The Separation Agreement provided that Bookman would enter into a

24-month non-compete agreement, abide by non-compete, non-disparagement, and

34

non-solicitation obligations, among other things.  He also was required provide his "best efforts" to promote the Debtor.

197.    Subsequent to Bookman's Separation Agreement and in connection with the Transaction, V3 negotiated for and obtained an agreement that Sphere would hire Bookman as one of five "key employees."  Otherwise, Bookman would have been prohibited by the Separation Agreement from being employed by Sphere.

198.    Upon the closing of sale of the Debtor's assets to Sphere in March 2014, Bookman went to work for Sphere.

199.    Sphere and Directors assisted with and made demands by and for and on behalf of Bookman for settlement of claims under threat of withholding liquidity from V3 and premised upon false pretextual claims of interference with the Bookman employment arrangements under Section 8.10 of the APA.

200.    Through improper means Sphere used the Anderer Lawsuit and the perjured testimony by Bookman to obtain a new leak-out provision and to stop V3 from being able to sell its shares even though it knew the Anderer Lawsuit was meritless and that the Bookman testimony was false.

201.    Sphere and Directors have intentionally interfered and continue to interfere with these existing contract relations in the following particulars:

202.    The Defendants' interference is motivated by and seeks to achieve the goals and benefits of the Bookman relationships with Sphere with no corresponding benefit to V3, specifically, the employment of Bookman by Sphere.

203.    The Debtor also has been damaged by the Sphere's conduct by being placed at a disadvantage in negotiations with Bookman and being forced to expend attorney's fees, dispute costs, and possibly excess payments to Bookman.

WHEREFORE, the Debtor requests entry of judgment against Sphere for damages caused by their interference as specified above as may be proven at trial, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

### SEVENTEENTH CLAIM FOR RELIEF
### (Interference With Existing Contractual Relations, Broker and Transfer Agent)

204.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

205.    An economic relationship existed between V3 and its securities broker and transfer agent concerning V3's efforts to lift the restrictive legend on the Sphere Stock and trade and realize the value of the stock it holds in Sphere on public exchanges.

206.    Sphere and Directors knew, or should have known, of the economic relationship between V3 and the brokerage and the transfer agents.

207.    The communications that Sphere and Directors had with the transfer agent concerning lifting of the restrictive legend so that V3 could trade its shares, wrongfully disrupted the business relationship with the brokerage and the transfer agents.  Defendants intended to disrupt the business relationship between V3 and its broker and transfer agents.

208.    The conduct of Sphere and Directors caused the Debtor to suffer economic injury flowing from its inability to liquidate its shares, to pay its just debts and obligations and to make appropriate lawful distributions to its shareholders.

WHEREFORE, the Debtor requests entry of judgment against Sphere and Directors for damages caused by their interference as specified above as may be proven at trial, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

### EIGHTEENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

209.     Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

210.     By reason of their positions as officers and directors of Sphere, Tassiopoulos, Meretsky, Ashkin, Kelly, Bowman, Biasini, Bordessa, and Mahadevan owed and owe Sphere and Sphere shareholders, including V3, fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sphere in a fair, just, honest, and equitable manner.  The Directors were and are required to act in furtherance of the best interests of Sphere and not in furtherance of their personal interest or benefit.

211.     To discharge their duties, the Directors were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of Sphere.  By virtue of such duties, the Directors were required to, among other things:

a.     Disclose material information to Sphere shareholders, including V3;

b.     Act and to cause Sphere to act lawfully and in accordance with the requirements of law;

c.     Act fairly towards and Sphere shareholders, including V3, and not to act unjustly, unfairly or oppressively;

     d.     Not to take any action that would unjustifiably impair the value of Sphere shareholders', including V3's, investment or enhance the value of any other shareholder's investment at V3's expense;

     e.     Refrain from usurping opportunities that Sphere could acquire to increase the value of Sphere shareholders', including V3's, investment;

     f.     Refrain from looting the assets of Sphere; and

     g.     Act with loyalty and fidelity to Sphere and Sphere shareholders, including V3, not to usurp any of Sphere's corporate opportunities.

212.     Sphere and the Directors were obligated to fully and accurately disclose all material facts relating to Sphere, its intellectual property, and operations, as well as any other material fact that may influence an investor's decision to invest in Sphere, to V3, its officers and directors, creditors, investors, and shareholders.

213.     Sphere and the Directors failed to disclose, and intentionally hid from V3, its officers and directors, creditors, investors, and shareholders, that they wanted to keep V3's Sphere Stock off the market for the reason of protecting their own interests and the interests of their friends and family.

214.     Sphere and the Directors failed to disclose, and intentionally hid from V3, its officers and directors, creditors, investors, and shareholders, that they intended to prevent V3 from selling its Sphere Stock on the open market to protect the personal exit strategies of Directors and unknown John Doe Defendants.

215.     Sphere and the Directors failed to disclose, and intentionally hid from V3, its officers and directors, creditors, investors, and shareholders, that they were motivated to interfere with the Earn-Out and stock sales in part to cover up their failure to negotiate a leak out

provision in the APA, and to impose terms on V3 that were neither negotiated nor agreed to in the APA, to facilitate the Overland acquisition, among other reasons.

216.   The failure to fully and accurately disclose all material facts relating to Sphere, its intellectual property, and operations, as well as any other material fact that may influence an investor's decision to invest in Sphere, to V3, its officers and directors, creditors, investors, and shareholders, and other acts of self-dealing by Sphere, and Directors, violated the fiduciary duties of Sphere and Directors.

217.   Because of these breaches of fiduciary duties the Debtor suffered damages including, but not limited to, defaulting on significant debt payments and other obligations made in reliance on V3's right to sell its Sphere Stock; being unable to sell the Initial Shares at a more favorable price; being unable to receive and sell the Holdback Shares at a more favorable price; being forced to enter into the October 10, 2014 Agreement that included, among other things, a leak out provision that further restricted V3's right to sell its Sphere Stock and to sell the Initial Shares at a more favorable price; and being placed at a disadvantage in negotiations with Bookman and Wiora and being forced to expend attorney's fees, dispute costs, and possibly excess payments to Wiora and Bookman.

WHEREFORE, the Debtor requests entry of judgment against Sphere and Directors for damages caused by their breaches of fiduciary duty as specified above as may be proven at trial, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

### NINETEENTH CLAIM FOR RELIEF
### (Constructive Conversion of Shares)

218.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

219.    The Debtor has the right to possess as its property the Sphere Stock V3 received in consideration for the APA.

220.    The interference, conduct and omissions of Sphere and Directors in blocking the stock sales, making unjustified and unspecified threats of breach and acts of breach of the APA and other conduct specified above, has effectively deprived V3 of its entire interest in its Sphere Stock.

221.    The Debtor has suffered damages as a result of Defendants' constructive conversion of its interest in the Sphere Stock.  Defendants are liable in money damages to the Debtor for the dollar value of the shares which would have been available on the open market had V3 been able to begin selling its shares on the open market as allowed by the APA, all as may be proven by competent evidence at trial.

WHEREFORE, the Debtor requests entry of a money judgment against Sphere and Directors for their constructive conversion of V3's Sphere Stock as may be proven by competent evidence at trial.

### TWENTIETH CLAIM FOR RELIEF
### (Fraud in the Offer and Sale of Securities, Rule 10b-5)

222.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

223.    In agreeing to accept the Purchase Price set forth in the APA, V3 was informed of, assumed, and justifiably relied upon the representations of Sphere officers that Sphere's shares were honestly traded and priced by legitimate public market factors and were not subject to any manipulation, fraud, insider trading, or other unlawful or improper activity.

224.    In agreeing to the share price of $5.23, V3 was informed of, assumed, and justifiably relied upon the representations of Sphere and the Directors that the shares were honestly traded and priced by legitimate public market factors and were not subject to any manipulation, fraud, insider trading, or other unlawful or improper activity.

225.    Sphere and the Directors, directly or indirectly, singly or in concert, and aiding and abetting one another, engaged in an unlawful combination, conspiracy and course of conduct pursuant to which Sphere and the Directors defrauded V3.  Sphere and the Directors made various untrue statements of material fact and omitted to state other material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading to V3.

226.    Sphere's and the Directors' misrepresentations, conduct and omissions herein alleged constitute a device, scheme or artifice to defraud V3 and constituted acts, practices and courses of business which would and did operate as a fraud or deceit upon V3 in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

227.    The purpose and effect of Sphere's and the Directors' misrepresentations, conduct and omissions, all of which were part and parcel of a common scheme and conspiracy to defraud, was to cause V3 to accept Sphere publicly trading stock as a significant and material part of consideration from the APA under which V3 parted with millions of dollars in valuable assets. Sphere and the Directors intended to maliciously block, devalue and convert V3's interest in the

Sphere Stock, singly and cumulatively, conceal the true condition of Sphere from V3 and all

such acts had the effect of supporting the market prices for Sphere's securities at artificially high

levels during the negotiation and closing period.  Defendants conspired with Anderer to support

Anderer's malicious attempts to enjoin sale of V3's shares of Sphere Stock in order to

manipulate the price of the Sphere Stock on the open market by artificially restricting share

volumes.  These acts and omissions destroyed the value of the stock in possession of V3.

228.    The fraudulent practices and devices utilized by Sphere and the Directors in order

to effectuate the aforesaid fraud consisted of misrepresentations of material facts by Sphere and

the Directors, who knew or should have known them to be false when made, who intentionally

concealed them and who failed to disclose omitted material facts which were necessary in order

to make the statements made not misleading to V3.

229.    Sphere and the Directors, by the acts and transactions set forth herein, have used

the means and instrumentalities of interstate commerce, and of the mails, to engage in acts,

practices, courses of business and manipulative and deceptive devices and contrivances, all

constituting and operating as a fraud in violation of Section 10(b) of the Exchange Act and the

rules and regulations promulgated thereunder.

230.    By reason of Sphere's and the Directors' misrepresentations, acts and omissions,

as alleged herein, the market price of the Sphere securities was caused to be inflated artificially

at the time of the closing of the APA with the intent and result of deceiving and inducing V3 to

accept such securities at such value as a significant part of the consideration for the sale and in

full reliance, with Plaintiff's knowledge, on the fact that V3 would be able to liquidate and obtain

value from the shares following the applicable Canadian holding period.  Defendants' scheme

results in a fundamental change in the nature of V3's investment in Sphere Stock.

231.    The Debtor has been damaged by Sphere's and the Directors' violation, acts and omissions alleged herein in an amount to be proven by competent evidence at trial.

WHEREFORE, the Debtor requests entry of judgment against Sphere and the Directors in the amount of damages caused by Sphere's and the Directors' conduct, acts and omissions as may be proven by competent evidence at trial.

**TWENTY-FIRST CLAIM FOR RELIEF**
**(Negligent Misrepresentation)**

232.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

233.    In agreeing to the share price of $5.23, V3 was informed of, assumed, and justifiably relied upon the representations of Sphere and the Directors that the shares were honestly traded and priced by legitimate public market factors and were not subject to any manipulation, fraud, insider trading, or other unlawful or improper activity.

234.    By virtue of the APA, V3 had a special relationship with Sphere and the Directors, and each owed a duty of good faith and fair dealing to V3.  As a result of this special relationship, Sphere and the Directors had a duty to impart correct information to V3, and not to intentionally mislead V3 by secretly and collectively manipulating information for their gain, and to V3's detriment.

235.    By entering into the APA, Sphere and the Directors necessarily represented to V3, among other things:

a.        that the shares of publicly trading stock that V3 was to receive were valued based on market factors and not the product of any fraud, manipulation or insider trading;

b.        that they, and each of them, would perform the terms of the APA fully and in good faith;

c.        that they, and each of them, would not unlawfully interfere with the benefit of V3's bargain under the APA;

d.        that they "shall not, directly or indirectly, intentionally or purposefully take any action that would have the purpose of avoiding or reducing any of the Earn-Out Payments" (APA, § 4.3(c));

e.        that they would "maintain separate accounting measures for the Business or product line, as applicable, such that the Earn-Out revenue can be calculated under the [as set forth in the APA] (2) maintain the Business or product line, as applicable, as an independent stand-alone business unit to be operated by Eric Lindstrom (or his successor) . . . , and (3) provide the Business with budgetary and personnel resources described in § 4.3 [of the APA]" (APA, § 4.3(e)(iii));

f.        that they, and each of them, would not unlawfully interfere with the benefit of V3's bargain under the APA; and

g.        that they, and each of them, would fairly perform the obligations of the APA in good faith.

236.    Sphere and the Directors made these representations, at a minimum, negligently and without reasonable justification.

237.    The misrepresentations were made with the intent that V3 would rely upon them.

238.    V3 reasonably relied on these representations and was thereby induced to enter into and perform the APA including realizing full consideration of $14.7 million.  As a result of negligent misrepresentations of these Defendants and others, the Debtor has suffered damages of not less than $10 million or such other and further sums as may be proven by competent evidence at trial.

WHEREFORE, the Debtor requests entry of judgment against these Defendants, and each of them, for a sum of not less than $10 million or such other and further sums as may be shown by competent evidence at trial, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

## TWENTY-SECOND CLAIM FOR RELIEF
### (Intentional Misrepresentation)

239.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

240.    In agreeing to the share price of $5.23, V3 was informed of, assumed, and justifiably relied upon the representations of Sphere and the Directors that the shares were honestly traded and priced by legitimate public market factors and were not subject to any manipulation, fraud, insider trading, or other unlawful or improper activity.

241.    At the time the Parties were negotiating the APA, Sphere and the Directors knowingly and willingly conspired to conceal and withhold material facts from V3 that would have revealed that Sphere stock was not honestly traded and priced by legitimate public market factors, but were the result of manipulation, fraud, or other unlawful and improper activity.

242.    By withholding this information, Sphere and the Directors intended to, and in reality did, induce V3 to justifiably rely on false or incomplete material facts.

243.    V3 reasonably relied on these false or incomplete material facts and was thereby induced to enter into and perform the APA including realizing full consideration of $14.7 million.  As a result of the concealment of these material facts, the Debtor has suffered damages of not less than $10 million or such other and further sums as may be proven by competent evidence at trial.

WHEREFORE, the Debtor requests entry of judgment against these Defendants, and each of them, for a sum of not less than $10 million or such other and further sums as may be shown by competent evidence at trial, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

### TWENTY-THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

244.    Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

245.    As set forth above, V3 conferred a benefit upon Sphere and Holdings by transferring its valuable assets having a transaction value of $14.7 million.

246.    Sphere and Holdings had knowledge of the benefit.

247.    Under these circumstances, it is inequitable for Sphere and Holdings to retain that benefit without full payment of the transaction value under the APA.

WHEREFORE, the Debtor requests that the Court enter judgment against Sphere and Holdings in a sum of not less than $10 million for such other and further sums are proven by

competent evidence at trial, for its costs, interest, and for such other and further relief as the Court deems just and equitable in the premises.

### TWENTY-FOURTH CLAIM FOR RELIEF
**(Temporary, Preliminary and Permanent Injunctive Relief)**

248.   Plaintiff restates and re-alleges each and every allegation contained in the previous paragraphs of this Complaint, and incorporates the same by reference as though fully set forth herein.

249.   If Defendants' bad faith conduct in unlawfully interfering with V3's ability to fully possess and  liquidate its shares immediately, is not immediately enjoined, both temporarily, preliminarily and permanently, V3 will be irreparably harmed by not being able to discharge certain creditor obligations in its  bankruptcy case, causing severe economic damages to V3 and its creditors and shareholders.

250.   V3 has a reasonable probability of prevailing upon the merits of its claims that Sphere has breached the APA with respect to the stock sale provisions and has unlawfully interfered with the stock sales.

251.   The subject matter of the injunction, shares of stock owned by V3, are such that V3 should not be required to post any bond to obtain injunctive relief.

252.   The Court should enter its temporary, preliminary and permanent order requiring Sphere to release the Holdback Shares, remove the restrictive legend from the Holdback Shares, and barring Sphere in any way objecting to, interfering with or otherwise halting or impairing V3's sales of its shares without regard to the Leak-Out provision in the October 10, 2014 Agreement, so long as such sales are in accordance with law and upon a recognized market for the securities under penalty of contempt of Court.

WHEREFORE, the Debtor requests entry of the Court's order requiring Sphere and Holdings, their principals, officers, agents, attorneys and assigns, to release the Holdback Shares, remove the restrictive legend from the Holdback Shares, and barring Sphere and Holdings, in any way, from objecting to, interfering with, delaying or impairing V3's sales of its shares without regard to the Leak-Out provision in the October 10, 2014 Agreement, so long as such sales are in accordance with law and upon a recognized market for the securities under penalty of contempt of Court.

## REQUEST FOR RELIEF

Based upon the foregoing, the Debtor prays for entry of judgment and relief against the Defendants, and each of them, in the following particulars:

A.      For an order and judgment disallowing Sphere's Proof of Claim in its entirety;

B.      For an order and judgment ordering turnover of the value of the maximum Earn-Out Amount of $5 million payable either by Earn-Out Shares, valued at a price as set forth in the APA, or in cash, under 11 U.S.C. § 542;

C.      For an order and judgment ordering turnover of the Holdback Shares under 11 U.S.C. § 542;

D.      For an order and judgment requiring either return of the assets conveyed in the APA or a money judgment for an amount in excess of $10 million;

E.      For compensatory, actual and consequential damages in an amount to be proven at trial, but in no event less than $5 million or the value of the Earn-Out Shares, whichever is greater;

F.      For compensatory, actual and consequential damages in an amount to be proven at trial, but in no event less than $10 million;

48

G.      For an order and judgment of specific performance, allowing the Debtor's

nominee to serve on the board of directors of Holdings, effective retroactively to the Closing

Date, and additional decree of specific performance requiring that all resolutions and other

actions of the board of directors of Holdings be reopened for vote with participation by the

V3 designated director;

H.      For an order and judgment requiring Sphere and Holdings, their principals,

officers, agents, attorneys and assigns, to release the Holdback Shares, remove the restrictive

legend from the Holdback Shares, and barring Sphere and Holdings, in any way, from

objecting to, interfering with, delaying or impairing V3's sales of its shares without regard to

the Leak-Out provision in the October 10, 2014 Agreement, so long as such sales are in

accordance with law and upon a recognized market for the securities under penalty of

contempt of Court; and

I.      For costs, interest, and for such other relief as this Court deems equitable, just and

proper.

DATED this 6th day of October, 2015.


/s/ Kevin N. Anderson
Peter W. Billings
Kevin N. Anderson
Douglas J. Payne
FABIAN VANCOTT
  a Professional Corporation
*Attorneys for UD Dissolution Liquidating Trust*

4811-4121-2713, v. 2